**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**
_____

No. 14-1271
_____

BRANDON TAYLOR,

*Appellant,*

v.

PENINSULA REGIONAL MEDICAL CENTER,

*Appellee.*
_____

BRIEF OF APPELLEE
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

(THE HONORABLE WILLIAM M. NICKERSON)
_____

Randi Klein Hyatt
Kevin M. Cox
Kollman & Saucier, P.A.
The Business Law Building
1823 York Road
Timonium, Maryland  21093
(410) 727-4300
Counsel for Appellee

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iii

I.   STATEMENT OF THE ISSUE .................................................1

II.  STATEMENT OF THE CASE ...................................................1

    A.   Introductory Statement ..........................................................1

    B.   Overview Of PRMC And Its Relevant Policies And Procedures ........4

    C.   Mr. Taylor Worked In PRMC's Security Department ........................4

    D.   In June 2010, Mr. Taylor Was Disciplined For An Incident In
         The Emergency Department That Was Rescinded From His Record .5

    E.   During His Appeal Of The ED Incident, Mr. Taylor Alleged For
         The First Time Racial Discrimination And That Mr. Patterson
         Had Made An Inappropriate Comment One Year Earlier ...................6

    F.   Mr. Taylor Concedes No Racial Pay Disparity ...................................8

    G.   Mr. Taylor Repeatedly Changed His Story During PRMC's
         Investigation Into His Refusing To Assist An Employee...................9

    H.   Mr. Taylor Refused To Cooperate With PRMC's Investigation
         Into His Allegations Of Sexual Harassment By Chief Tull .............10

    I.   Mr. Taylor Acted Inappropriately During His July 15 Meeting
         With Ms. Scott ..................................................................................11

    J.   PRMC Understood Mr. Taylor To Have Resigned While On
         Administrative Leave, But Even If He Had Not Resigned
         PRMC Would Have Terminated Him .................................................14

III. SUMMARY OF ARGUMENT ......................................................16

IV.  ARGUMENT..................................................................................18

A.   Retaliation Under Title VII and 42 U.S.C. § 1981 ............................18

B.   Mr. Taylor Established A *Prima Facie* Case Of Retaliation,
     But PRMC Articulated Legitimate Nondiscriminatory Reasons
     For Termination ...............................................................................20

C.   Mr. Taylor Believes That PRMC's Legitimate, Nondiscriminatory
     Reasons For His Termination Are Pretexual For Only
     Two Reasons ....................................................................................22

D.   PRMC Has Always Maintained That Mr. Taylor Resigned..............23

E.   Mr. Taylor Could Not Demonstrate Pretext......................................24

V.   CONCLUSION .........................................................................................30

CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)

## <u>TABLE OF AUTHORITIES</u>

*Adams v. Trustees of Univ. of North Carolina-Wilmington*,
  640 F.3d 550 (4th Cir. 2011) ...........................................................................19

*Armstrong v. Index Journal Co.*,
  647 F.2d 441 (4th Cir. 1981) ..........................................................................27

*Bryan v. Prince George's Cnty.*,
  2011 U.S. Dist. LEXIS 71795 (D. Md. July 5, 2011) ............................. 20, 29

*Bryant v. Aiken Reg'l Med. Ctrs. Inc.*,
  333 F.3d 536 (4th Cir. 2003) ..........................................................................18

*Hawkins v. PepsiCo., Inc.*,
  203 F.3d 274 (4th Cir. 2000) ..................................................................... 26, 27

*Hoyle v. Freightliner, LLC*,
  650 F.3d 321 (4th Cir. 2011) ..........................................................................19

*Hux v. City of Newport News*,
  451 F.3d 311 (4th Cir. 2006) ..........................................................................20

*Khoury v. Meserve*,
  268 F. Supp. 2d 600 (D. Md. 2003) ......................................................... 28, 29

*Mallory v. Booth Refrigeration Supply Co.*,
  882 F.2d 908 (4th Cir. 1989) ..........................................................................18

*Pulley v. KPMG Consulting, Inc.*,
  348 F. Supp. 2d 388 (D. Md. 2004) ................................................................27

*Robinson v. Baltimore City Police Dept.*,
  181 F. Supp. 2d (D. Md. 2002) .......................................................................26

*Rogosin v. Mayor & City Council of Balt.*,
  197 F. Supp. 2d 345 (D. Md. 2002) ................................................................29

*Ross v. Communications Satellite Corp.*,
    759 F.2d 355 (4th Cir. 1985) ...........................................................................26

*Smith v. Vilsack*,
    832 F. Supp. 2d 573 (D. Md. 2011).............................................................20

*St. Mary's Honor Ctr.v. Hicks*,
    509 U.S. 502 (1993)......................................................................................19

*Texas Dep't of Community Affairs v. Burdine*,
    450 U.S. 248 (1981)................................................................................. 19, 20

*Von Gunten v. Maryland*,
    243 F.3d 858 (4th Cir. 2001) .......................................................................19

## **Statutes**

42 U.S.C. § 1981 .................................................................................................1, 18

42 U.S.C. § 2000e .............................................................................................1, 18

42 U.S.C. § 2000e-3(a) ........................................................................................18

# I.   <u>STATEMENT OF THE ISSUE</u>

Did the district court properly find that Mr. Taylor could not demonstrate that PRMC's legitimate and nondiscriminatory reasons for his dismissal were pretextual?

# II.   <u>STATEMENT OF THE CASE</u>

## A.   **Introductory Statement.**

Brandon Taylor, who is African-American, worked as a Security Officer for Peninsula Regional Medical Center (PRMC or the Hospital) for approximately four years.  (J.A. 805).  He sued PRMC for race discrimination and retaliation under 42 U.S.C. § 2000(e) (Title VII) and 42 U.S.C. § 1981 claiming:  (1) his wages were lower than his white counterparts; (2) he was denied the opportunity to carry a weapon because of his race; and (3) he was terminated because of his race and/or in retaliation for various perceived discrimination complaints he made during his employment.  (J.A. 6-15).

The parties engaged in extensive discovery and, at the conclusion of discovery, PRMC filed a Motion for Summary Judgment as to all Mr. Taylor's claims.  (J.A. 805; 812; App. Br. at 2).  Mr. Taylor abandoned his Title VII and Section 1981 race discrimination claims after PRMC filed for summary judgment, but still pursued his retaliation claims under both statutes.  (J.A. 805).  On March 10, 2014, the Honorable William M. Nickerson issued his decision granting

summary judgment. (J.A. 805-30). PRMC was granted summary judgment because Mr. Taylor did not offer sufficient evidence that PRMC's legitimate nondiscriminatory reasons for his termination were pretextual. (J.A. 824-28). Mr. Taylor appealed. (J.A. 831). Although PRMC sets forth a more detailed Statement of Facts below, by way of context and background, PRMC summarizes here the most pertinent facts as to the appeal.

In July 2010, Mr. Taylor engaged in multiple instances of employee misconduct.[1] (*See e.g.*, J.A. 305-08; 806-10). On July 2, he refused to assist a distressed employee who called for help from a PRMC parking lot. (*See e.g.*, J.A. 305-08; 808). Mr. Taylor then repeatedly lied about his knowledge and involvement when questioned by PRMC's then Director of Human Resources Mitzi Scott, giving four different explanations. (*See e.g.*, J.A. 305-08; 808).

On July 8, Mr. Taylor refused to cooperate with an investigation into sexual harassment allegations against his superior, for which Mr. Taylor was the impetus

---

[1] Immediately following his involvement in the Emergency Department incident in June 2010 (explained *infra* at pp. 5-6), Mr. Taylor began to raise concerns about alleged discrimination. *Infra* at pp. 5-7. His timing is suspect, particularly waiting more than a year to first claim that he was offended by the alleged "Mexican" comment (explained *infra* at pp. 7-8). Indeed, Mr. Taylor's discriminatory complaints to PRMC, all of which were withdrawn from his Complaint, were a feeble and late-played attempt to cloak him with statutory protection.

2

of the claim being raised and for which he claimed to have knowledge. (*See e.g.*, J.A. 305-08; 808-09).

On July 15, during a meeting with Ms. Scott, Mr. Taylor continued to refuse to cooperate in the sexual harassment investigation and repeatedly lied about his involvement and knowledge of the July 2 parking lot incident. (*See e.g.*, J.A. 305-08; 808-09). In addition to his failed cooperation in the investigation, Mr. Taylor yelled and shouted at Ms. Scott; exhibited unprofessional, hostile, and intimidating behavior such that Ms. Scott feared for her safety; and called Ms. Scott names during the meeting. (*See e.g.*, J.A. 305-08; 808-10).

His behavior was loud and boisterous enough that other persons came out of their offices to see what was occurring. (*See* J.A. 260-61; 306). Mr. Taylor was then placed on administrative leave, following this series of transgressions. (*See e.g.*, J.A. 305-06; 809-10). Mr. Taylor only then claimed that he had filed an Equal Employment Opportunity Commission (EEOC) complaint. (*See e.g.*, J.A. 276; 305-06; 810).

On July 19, Mr. Taylor told PRMC that it would receive his "resignation and other paperwork" shortly. (*See e.g.*, J.A. 306; 407; 810). On July 26, having not received Mr. Taylor's written resignation, PRMC accepted his verbal resignation and confirmed this in writing to him. (*See e.g.*, J.A. 305-06; 810).

3

The district court found that Mr. Taylor raised a genuine issue of material fact as to whether he resigned, J.A. 820-21, but his termination status (*i.e.,* resignation or involuntary termination) was immaterial, J.A. 822-28.  Assuming Mr. Taylor was terminated, the district court found he engaged in conduct justifying termination, and he did not establish that PRMC acted with pretext in regard to these employment actions.  (J.A. 820-28).  Mr. Taylor solely appeals the trial court's finding that he did not demonstrate that PRMC's legitimate and nondiscriminatory reasons for his termination were pretextual.  (*See* App. Br. at 1).

## B.    Overview Of PRMC And Its Relevant Policies And Procedures.

PRMC is located in Salisbury, Maryland, is the Delmarva Peninsula's largest advanced tertiary care facility, and employs approximately 2,841 individuals.  (J.A. 30).  Its policies prohibit discrimination and harassment on the basis of race, or any other protected characteristic.  (J.A. 34-36; 41-42).  PRMC also maintains policies and procedures governing appropriate standards of behavior and employee conduct.  (J.A. 34-40).  Mr. Taylor received an employee handbook with these policies.  (J.A. 37-40, 43).

## C.    Mr. Taylor Worked In PRMC's Security Department.

Mr. Taylor worked in PRMC's Security Department from June 2006 until July 2010.  (J.A. 805).  His shift supervisor was Anthony Tull (African-American),

4

the Director of Protection Services (or Security Department Chief) was Alonzo

Tull (African-American) (Chief Tull), and Chief Tull's direct supervisor was Bruce

Patterson (Caucasian) (Mr. Patterson), Director of Facilities and Maintenance.

(J.A. 103; 172; 805-06).

### D.    In June 2010, Mr. Taylor Was Disciplined For An Incident In The Emergency Department That Was Rescinded From His Record.

Between June and July 2010, Mr. Taylor was involved in multiple

workplace incidents relevant to his separation.  (J.A. 806).  The first incident, for

which his discipline was rescinded, occurred in June 2010, and involved an unruly

patient who fell in the Emergency Department (the ED Incident) in the presence of

Mr. Taylor, two other officers (one Caucasian and one African-American, J.A. 70,

143-44), and a Caucasian nurse.  (J.A. 295; 287-89; 806).

All three officers were placed on administrative leave pending an

investigation, which ultimately revealed that the patient was not pushed.  (J.A.

183-84; 806).  The three security officers received a written warning for failing to

help the patient up or seeing if she was injured, and were disciplined equally.[2]

(J.A. 183-84; 205; 806).

---

[2]  The consensus was that the officers interpreted their training too literally, did not make necessary independent judgment, and could have done more (*e.g.*, help the patient back to bed), so some discipline was warranted.  (J.A. 294-95).  The nurse was terminated.  (J.A. 806).

5

Believing he was unfairly disciplined, and within days of the discipline, Mr.

Taylor visited the Executive Vice President and Chief Operating Officer at PRMC,

Lura Lunsford (Caucasian) (Ms. Lunsford).  (J.A. 807).  Ms. Lunsford investigated

Mr. Taylor's concerns and concluded that the discipline was unwarranted because

the officers' actions were consistent with their training.  (J.A. 807).  She saw the

ED incident as a teachable moment for all involved.  (J.A. 298-99).  Ms. Lunsford

and Mr. Patterson then conferred with another PRMC supervisor, Craig

Koppenhaver, and they collectively rescinded the discipline.  (J.A. 297-98; 807).[3]

The ED incident and discipline were removed from Mr. Taylor's record.  (J.A.

807).

**E.**     **During His Appeal Of The ED Incident, Mr. Taylor Alleged**
        **For The First Time Racial Discrimination And That Mr.**
        **Patterson Had Made An Inappropriate Comment One Year Earlier.**

In conjunction with his appeal to Ms. Lunsford regarding the ED Incident,

Mr. Taylor made allegations of racial discrimination relating to perceived pay

disparity and the denial of his repeated requests to carry a weapon.  (*See e.g.,* J.A.

307; 524; 668-69).  Although he was aware of PRMC's policies and procedures to

address concerns of discrimination, Mr. Taylor never brought these concerns to

---

[3]  This is one of many facts that Mr. Taylor either does not accurately describe or
completely distorts.  (*See* J.A. 6 (implying that it was Ms. Lunsford who solely
"ordered that the discipline be revoked," rather than a collaborative effort
involving Mr. Patterson and Mr. Koppenhaver.)).

PRMC's Human Resources department or any person having decision-making

authority as to his discharge, until appealing the discipline he received for the ED

Incident.  (J.A. 88; 156-57).

Mr. Taylor reported to Ms. Lunsford an isolated comment he claimed Mr.

Patterson made sometime in May or June 2009.  (J.A. 807).  Mr. Taylor claimed he

heard Mr. Patterson make the statement over PRMC's radio system to "get the

damn Mexicans off of the property," referring to a crew of construction workers on

Hospital property.  (J.A. 108; 110; 807).  He never told Mr. Patterson that he heard

the alleged comment or was offended by it, nor did he report it to Human

Resources or Mr. Patterson's supervisor, Ms. Lunsford.   (J.A. 96; 101-05; 157;

267-70; 292).  Rather, he waited until more than one year to report the comment,

and did so only in response to the discipline he initially received from the ED

incident.  (J.A. 101-05; 157; 267-70; 292).

Despite more than one year passing since the alleged comment had been

made, PRMC investigated.  PRMC was unable to corroborate that any other person

7

had heard Mr. Patterson utter those words (or similar words).[4]  (J.A. 191; 267-70;

807-08).  Mr. Taylor was told there was no corroboration regarding the Mexican

comment.  (J.A. 269-71).

**F.    Mr. Taylor Concedes No Racial Pay Disparity.**

Mr. Taylor originally filed suit alleging, *inter alia*, race-based discrimination

relating to perceived pay discrimination.  (J.A. 8; 11; 13).  Discovery confirmed,

however, that in his Department, PRMC employees' salaries were based solely on

years of experience and a standard formula.  (J.A. 212-20; 231; 278).  Likewise,

salary increases are based entirely on a flat percentage rate.[5]  (J.A. 222-23).  If an

employee receives a satisfactory evaluation, they then receive a set percentage

increase effective July 1.[6]  (J.A. 222-23).

---

[4]  The investigation confirmed that PRMC had a policy in place that at least one
member of any construction crew had to be able to communicate in English for
safety reasons, and that any statement that Mr. Patterson may have uttered was that
the workers who were directing traffic and talking with drivers had to be able to
speak English, and if they could not, those workers needed to be removed from
that task for safety concerns.  (J.A. 190; 267-71; 296; 808).

[5]  Mr. Taylor's earning additional stripes in 2008 and 2010 did not increase his
pay.  (J.A. 198-99; 63-64; 68-69; 265-66).  PRMC also reviews market data and
may do a market adjustment where it would increase the range.  (J.A. 223).
Employees within the same position receive the same adjustment.  (J.A. 223).

[6]  That Mr. Taylor received his last raise "just over one month before his"
separation from employment, App. Br. at 3, is, therefore, irrelevant.

Mr. Taylor realized no racial discrimination existed in terms of pay and that his raises resulting from his "plain vanilla" satisfactory evaluations (the last occurring approximately one month prior to his misbehavior leading to his departure) had nothing to do with job performance, but rather were based strictly on a uniformly applied formula. He learned that every security officer was treated equally in terms of pay and that he received the same percentage raises as his Caucasian counterparts. (*See* J.A. 31-32; 282-85). He dismissed his pay disparity claim. (J.A. 805; App. Br. at 2).[7]

## G.    Mr. Taylor Repeatedly Changed His Story During PRMC's Investigation Into His Refusal To Assist An Employee.

Mr. Taylor's second disciplinary incident occurred on July 2, 2010, when PRMC received a complaint that Mr. Taylor refused to assist a distressed employee who called for help because a parking lot cleaning machine vendor was circling her vehicle. (J.A. 808). The employee called security at 7:26 a.m., was scared and crying, and spoke with Mr. Taylor. (J.A. 237-38; 808). She reported that Mr. Taylor refused to assist her, claiming he was too busy and he could not do anything about the vendor. (J.A. 237-44; 305-06; 808). PRMC questioned Mr. Taylor

---

[7]  Mr. Taylor also alleged race-based discrimination relating to PRMC's denial of his repeated requests to carry a gun. (J.A. 11; 13). He voluntarily dismissed this discrimination claim as well. (*See* J.A. 805; App. Br. at 2). (*See generally* J.A. 31-32; 61; 67; 172-78; 200-03).

9

regarding this situation multiple times and each time he changed his story. (J.A. 237-44; 305-06; 808).

When first questioned about the incident (on July 7, 2010), Mr. Taylor claimed that he did not take the call. (*See* J.A. 237-44; 306). On July 8, Mr. Taylor claimed he was not carrying a security phone that day until 9:30 a.m., so he could not have taken the call. (*See* J.A. 237-44; 305-06). Mr. Taylor then, on July 9, admitted to taking the call after being confronted with a security tape that showed him answering the call at 7:26 a.m., but claimed, for reasons still unclear, that he thought he was being questioned about an unrelated patient complaint in a different garage.[8] (*See* J.A. 237-44; 305-06). Given his multiple versions of events and the security tape of him taking the call, Ms. Scott concluded that Mr. Taylor was being dishonest and deceptive. (J.A. 243-44).

## H.    Mr. Taylor Refused To Cooperate With PRMC's Investigation Into His Allegations Of Sexual Harassment By Chief Tull.

Mr. Taylor's failed cooperation in a sexual harassment investigation that he prompted against Chief Tull, based on allegations from six months to a year earlier, also raised significant concerns. (J.A. 236; 808). A female employee brought sexual harassment allegations against Chief Tull and advised Ms. Scott

---

[8] Two individuals who witnessed Ms. Scott's conversation with Mr. Taylor concerning the employee's call for assistance confirm that this conversation never included anything related to a patient in Parking Garage B. (J.A. 306).

10

that Mr. Taylor had told her (the female employee) that he (Mr. Taylor) knew of two female employees (nursing assistants) who had been "rubbed and touched" by Chief Tull, and that it was Mr. Taylor who encouraged the female employee to bring her claims forward. (J.A. 250-52; 309-10). Mr. Taylor only encouraged the reporting after the ED and parking lot incidents. (J.A. 305-10).

Ms. Scott reached out to Mr. Taylor to investigate what he knew about Chief Tull's alleged harassment of the other female employees. (J.A. 249). Mr. Taylor was difficult, evasive, and refused to cooperate with PRMC's investigation. (J.A. 249-56; 808-09). He changed his story regarding the allegations that these unnamed female employees supposedly had made against Chief Tull and whether another PRMC employee was also present during the conversations with these unnamed employees. (J.A. 257; 305). Despite his refusal to cooperate with the investigation, Mr. Taylor continued to make accusations against Chief Tull, J.A. 305-06, and continued to appear deceptive. (J.A. 257).

## I.    Mr. Taylor Acted Inappropriately During His July 15 Meeting With Ms. Scott.

The culmination of work place incidents (the fourth in approximately one month) involving Mr. Taylor occurred on July 15, 2010, during Ms. Scott's third attempt to obtain Mr. Taylor's cooperation to identify the two other possible victims/witnesses in the Chief Tull sexual harassment investigation. (J.A. 305-06;

809).  Ms. Scott asked Mr. Taylor to come to her office so she could discuss with him his concerns he had previously raised (including the alleged "Mexican" comment and his complaints relating to pay); and also to show him pictures of PRMC employees to help identify the two employees who had allegedly expressed concerns regarding Chief Tull.  (J.A. 252-53; 305-06).

Mr. Taylor once again changed his story, now claiming that he never said Chief Tull had "rubbed and touched" the female employees and contradicted other facts previously expressed.  (J.A. 257 ("when I asked him how the females had said they were sexually harassed, he said Alonzo rubbed and touched.  And then when I talk about that later in another meeting, he said that he never said that."); 305-08).  He plainly refused to cooperate with the investigation.[9]  (J.A. 254-56).

During the meeting Mr. Taylor "began to raise his voice, was speaking very loudly, and accused the Hospital of discriminating against him and repeatedly called Ms. Scott a racist."  (J.A. 258; 305-06; 809).  His behavior caused Ms. Scott to be "afraid" and "concerned about [her] safety."  (J.A. 261).

---

[9]  Despite Mr. Taylor's unreliability and inconsistency in his stories, PRMC investigated his allegations and concerns of sexual harassment by Chief Tull to the best of its ability.  (*See* J.A. 305-08).  PRMC also investigated "Mr. Taylor's accusations that there were race-based disparities in pay," and confirmed to Mr. Taylor that there were no inaccuracies.  (J.A. 270).  Mr. Taylor concedes these facts.  (J.A. 805; 812; App. Br. at 2).

12

Based on his unacceptable behavior during their meeting, and because he repeatedly "'refus[ed] to cooperate during [the] investigation[,] … chang[ed his] stories' and behaved poorly in her office, [Ms.] Scott informed [Mr.] Taylor that he was being placed on administrative leave." (J.A. 245-46; 809). At this juncture, Mr. Taylor responded he was going to go to the news and had filed an EEOC complaint. (J.A. 276; 305-06).

Ms. Scott advised Mr. Taylor to remain in her office so she could get security to escort him out of the building. (*See e.g.,* J.A. 261; 263; 306). Mr. Taylor told Ms. Scott she could not tell him what to do because she was not his "mama." (*See* J.A. 259-60; 305-06; 495). He then "stood up, which scared [Ms. Scott], put his hand in his pocket . . . and pulled out a silver device [apparently a small audio recorder] and said 'gotcha.'" (J.A. 154-55; 259-60; 305-06).

Mr. Taylor was unprofessional, hostile, and intimidating toward Ms. Scott during the July 15 meeting to the point that Ms. Scott feared for her safety. (J.A. 338-39). He was extremely angry and loud and used aggressive language resulting in several employees coming into the area to see what was happening. (*See* J.A. 258-63; 306). Indeed, these employees remained nearby and followed Mr. Taylor as he walked out of the building to ensure that the situation did not escalate further. (*See e.g.,* J.A. 261-64; 306). Mr. Taylor's actions violated PRMC's policies

13

governing appropriate standards of behavior and employee conduct. (*See* J.A. 37-40).

**J.    PRMC Understood Mr. Taylor To Have Resigned While On Administrative Leave, But Even If He Had Not Resigned, PRMC Would Have Terminated Him.**[10]

On July 19, 2010, Mr. Taylor called to speak with Ms. Lunsford. (J.A. 503-04; 810). Ms. Lunsford's assistant, Karen Long, answered the phone, and Mr. Taylor told her that he was resigning and that his paperwork would be forthcoming. (J.A. 407; 810). One week later, having not received Mr. Taylor's written resignation, PRMC wrote to Mr. Taylor accepting his verbal resignation, and confirming that his employment separation would be effective July 26, 2010.[11] (J.A. 305-06; 810; 820).

The notice detailed Mr. Taylor's behavior leading up to him being placed on administrative leave, including his allegations against Mr. Patterson and his conduct during the investigation into Chief Tull. It specifically states that:

---

[10]  The district court found that Mr. Taylor raised a genuine issue of material fact regarding whether he resigned or was terminated. (J.A. 820-21). PRMC does not challenge that finding on appeal, because PRMC still maintains (as it always has) that the reasons for accepting Mr. Taylor's resignation (*i.e.* its reasons for terminating him) confirm no pretext, which the district court also confirmed. (*See* J.A. 826 (citation omitted)).

[11]  This "Disciplinary Action" letter was drafted and updated during the time period leading up to Mr. Taylor's separation from employment. (*See* J.A. 305-06).

14

> Taylor 'had no firsthand knowledge of any of the
> improper conduct by [Chief Tull] that [Taylor] publically
> alleged' to another employee, that he became hostile
> toward Scott, and that he routinely changed his
> explanations regarding the above incidents. It stated,
> 'Your conduct constitutes making defaming, slanderous
> or false statements; deliberate omission, falsifications or
> misrepresentation of material information during an
> investigation; retaliatory conduct against your
> management team; hostile and intimidating conduct
> while on duty.'

(J.A. 810-11 (quoting J.A. 672-73) (emphasis added)).[12]  This "suggests that

PRMC intended to terminate [Mr. Taylor]" had he not resigned. (J.A. 821-22).

While Mr. Taylor has repeatedly denied providing his verbal resignation to

Ms. Long (a conversation contemporaneously documented in writing), J.A. 810,

and claims that he was the victim of conspiracy of "a whole administration of

people at PRMC . . . who are trying to protect their rear ends," *see e.g*., J.A. 147-

50, including Ms. Long with whom he had only one previous conversation, J.A.

150-52, Mr. Taylor never contested the resignation designation in the letter, J.A.

---

[12] The notice also detailed Mr. Taylor's actions relating to the parking lot incident.
(J.A. 672-73).

168-170.[13]  PRMC "does not dispute, however, that had [Mr.] Taylor not chosen to resign, it would have terminated his employment."  (J.A. 820 (citation omitted)); 822 (citation omitted) ("At Taylor's unemployment benefits hearing, PRMC Employee Relations Manager Craig Koppenhaver stated, in relevant part, that 'Mr. Taylor verbally communicated to the assistant to our president that he was resigning, that we would get it, be getting a letter from him.  He never submitted a letter of resignation.  We ended up terminating him.'"); *see generally* J.A. 820-22).

## III.  <u>SUMMARY OF ARGUMENT</u>

While the district court found that Mr. Taylor presented a *prima facie* case of retaliation, it further found that, if he did not resign, then PRMC articulated

---

[13]  The district court recognized that PRMC set forth "numerous, serious credibility allegations with respect to [Mr.] Taylor."  (J.A. 821 n.4).  Specifically, PRMC explained that Mr. Taylor, an admitted perjurer:

> has previously been accused of unemployment fraud, has misrepresented his attendance at colleges and universities, and has falsified information on employment applications.  .  .  .  Additionally, [PRMC] notes that Taylor previously made allegations against two prior employers for racial discrimination . . . <u>despite testifying to the contrary in his deposition</u>.

(J.A. 821 n.4 (citing *inter alia*, J.A. 423-63); *see also* J.A. 56-58; 86-87; 92-94; 111-33 (Mr. Taylor explaining his reasoning for perjuring himself at day one of his deposition <u>in this case</u>) (emphasis added)).  Significantly, Mr. Taylor's counsel even represented him in two previous and different lawsuits against another employer.  (J.A. 423-54).  Appropriately, the district court did not consider Mr. Taylor's credibility in rendering its opinion.  (J.A. 821 n.4).

16

legitimate nondiscriminatory reasons for his termination that were not pretext. Mr. Taylor does not dispute that PRMC articulated legitimate nondiscriminatory reasons for his termination, but rather that PRMC's stated reasons were pretextual.

First, Mr. Taylor claims that PRMC's consistent position that he resigned is somehow evidence of pretext. Such argument does not support pretext. PRMC concluded Mr. Taylor resigned based on his telephone call to PRMC confirming same. When PRMC did not receive Mr. Taylor's written resignation after a week, it justifiably and logically wrote him confirming its acceptance of his resignation.

Based upon the parking lot incident, the sexual harassment investigation, and the July 15 meeting resulting in Mr. Taylor being placed on administrative leave (all events occurring less than a month prior to employment separation), PRMC would have terminated Mr. Taylor had he not resigned. PRMC's position that Mr. Taylor resigned has been in place all along. That being said, the district court found a dispute on the issue. That dispute, however, does not create pretext.

Second, Mr. Taylor argues that PRMC's position that he was terminated for his actions and behavior relating to the parking lot incident, the sexual harassment investigation, and the July 15 meeting conflicts with the evidence. He believes that he did nothing wrong relating to the parking lot incident and that it is unlikely that he would refuse to help an employee, that PRMC misinterpreted his behavior

17

relating to the sexual harassment investigation, and that Ms. Scott's version of
events during their July 15 meeting is incorrect.

None of this saves Mr. Taylor's case, because it is not evidence of pretext,
*i.e.*, evidence that PRMC's reasons for accepting his resignation/terminating him
were fabricated and the real reason is based on discriminatory intent.  While he
does not have to agree with PRMC's employment decision, that does not make it
retaliatory.  Mr. Taylor is solely responsible for the end of his employment with
PRMC.  His protected activity was irrelevant.  Summary judgment was, therefore,
appropriate, and the opinion of the district court should be affirmed.

## IV.    <u>ARGUMENT</u>

### A.    **Retaliation Under Title VII and 42 U.S.C. § 1981.**[14]

An employer may not "discriminate against any of its employees . . .
because he has opposed any practice made an unlawful employment practice . . . or
because he has made a charge, testified, assisted, or participated in any manner in
an investigation, proceeding, or hearing . . ."  42 U.S.C. § 2000e-3(a).  In order to
prove retaliation, a plaintiff must demonstrate that "(1) [he] engaged in protected

---

[14]  The standards of proof for retaliation claims under Title VII and 42 U.S.C.
§ 1981 are the same.  *Bryant v. Aiken Reg'l Med. Ctrs. Inc*., 333 F.3d 536, 543 (4th
Cir. 2003).  *See e.g., Mallory v. Booth Refrigeration Supply Co*., 882 F.2d 908, 910
(4th Cir.1989) ("the framework of proof . . . is the same for actions brought under
Title VII or § 1981.").  Therefore, reference to retaliation under both statutes is
collectively referred to as "retaliation."

18

activity, (2) the employer took adverse employment action against [him], and (3) a causal connection existed between the protected activity and the asserted adverse action." *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001) (citation omitted). Only the third element is at issue on appeal. (J.A. 805-30).

If a plaintiff establishes a *prima facie* case of retaliation, "a presumption of illegal discrimination arises, [then] the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant" and "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).

When the defendant meets its burden of production (as is the case here, *see e.g.,* J.A. 824; App. Br. at 1), the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. *See Adams v. Trustees of Univ. of North Carolina–*

19

*Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (citation omitted) (emphasis in original); *Smith v. Vilsack*, 832 F. Supp. 2d 573, 584 (D. Md. 2011).

Thus, to meet his burden, Mr. Taylor must persuade this Court that an illegal reason "more than likely motivated" PRMC or that PRMC's "proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. He "must point to facts that render [PRMC's] reason so questionable as to raise an inference of deceit." *Bryan v. Prince George's Cnty.*, No. DKC-10-2452, 2011 U.S. Dist. LEXIS 71795 at *17 (D. Md. July 5, 2011). He must develop some evidence on which a juror could reasonably base a finding that retaliation motivated his discharge. *See e.g., Hux v. City of Newport News*, 451 F.3d 311, 316 (4th Cir. 2006) ("the plaintiff cannot seek to expose that rationale [for termination] as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are irrelevant to it."). Mr. Taylor did none of this (nor could he have).

**B.     Mr. Taylor Established A *Prima Facie* Case Of Retaliation, But PRMC Articulated Legitimate Nondiscriminatory Reasons For Termination.**

Mr. Taylor maintains that he was terminated shortly after engaging in the following protected activity: (1) complaining about Mr. Patterson's alleged

"Mexican" comment; (2) complaining about perceived pay and weapon assignment

disparities between he and his Caucasian co-workers; (3) complaining about the

initial (and rescinded) discipline he received relating to the ED Incident as well as

his general feeling of what he perceived as "racial issues" with Mr. Patterson; and

(4) informing Ms. Scott, immediately after being informed that he was being

placed on administrative leave, that he filed an EEOC complaint.[15]  (J.A. 819

(citation omitted); App. Br. at 7-8).

　　　The district court found that Mr. Taylor established a *prima facie* case of

retaliatory discharge because he raised a material issue of fact of whether he

resigned and because of the temporal proximity between his protected activity and

alleged termination.  (J.A. 820-24).  The burden then shifted to PRMC to

"articulate a lawful, non-retaliatory reason for the adverse employment decision."

(J.A. 824 (citations omitted)).  As Judge Nickerson wrote, PRMC:

> has done exactly that by, detailing Taylor's
> uncooperative behavior during the investigation into
> Chief Tull's alleged sexual misconduct, his failure to
> assist the employee in the parking garage, and his
> 'improper, abusive, and even frightening' conduct during
> his meeting with Scott.  [PRMC] describes Taylor's
> course of conduct in June and July 2010 as escalating, to
> the point that he could no longer be considered a
> trustworthy employee.  By articulating its concerns with

---

[15]  PRMC first learned of Mr. Taylor's EEOC Complaint after he was placed on administrative leave on July 15, 2010.  (*See* J.A. 258).

> Taylor's performance in the workplace environment,
> [PRMC] has stated a lawful, non-retaliatory reason for
> his alleged discharge.

(J.A. 824 (citation omitted) (emphasis added)).  Mr. Taylor does not dispute this,

and the only issue on appeal is whether Mr. Taylor satisfied his burden of proving

that the legitimate, nondiscriminatory grounds PRMC provided for Mr. Taylor's

alleged discharge were pretext.  (*See* App. Br. at 1).

## C.     Mr. Taylor Claims That PRMC's Legitimate, Nondiscriminatory Reasons For His Termination Are Pretextual For Only Two Reasons.

First, Mr. Taylor perceives PRMC's position that he resigned as evidence of

pretext.  (App. Br. at 14-15).  He believes that "PRMC cannot have a legitimate,

nondiscriminatory reason for terminating [him] when it adamantly contends that"

he resigned.  (App. Br. at 14).

Second, he contends that "PRMC's assertion that, even if Mr. Taylor was

terminated, his termination would have been based on misconduct, conflicts with

the evidence in this matter."  (App. Br. at 15).  The "misconduct" Mr. Taylor refers

to are the three "nondiscriminatory reasons for Appellant's discharge:"  (1) his

"failure to cooperate with the sexual harassment investigation regarding Chief

Tull;" (2) his "failure to assist an employee in the parking garage;" and (3) his

"improper conduct during [his] meeting with Ms. Scott."  (App. Br. at 13; *see* J.A.

826 (identifying Mr. Taylor's basis for his pretext allegations)).

22

**D.    PRMC Has Always Maintained That Mr. Taylor Resigned.**

PRMC's position has always been the same:  Mr. Taylor resigned.  Mr.

Taylor, however, believes this to be direct and conclusive evidence of pretext.

(App. Br. at 14-15).  Mr. Taylor is wrong and misconstrues the facts.

At Mr. Taylor's Department of Labor, Licensing and Regulation Division of

Appeals hearing (DLLR hearing), PRMC's non-attorney representatives testified

that they considered Mr. Taylor to have resigned, and explained why, in the

alternative, if he was found to have been terminated, that it was for a

"disqualifying reason" for unemployment purposes.  The hearing transcript is

clear:

> We waited for [Mr. Taylor's] resignation.  <u>When he
> didn't submit his resignation, we decided that we had to
> bring this to closure somehow.</u>  Based on the conduct that
> he exhibited with Ms. Scott on July 15, <u>our decision, had
> he not chosen to resign, would have been to terminate.</u>
> So for all intents and purposes this is a discharge.

(J.A. 330-31 (emphasis added); *see* J.A. 822, n.5 (citation omitted)).

PRMC believed Mr. Taylor to have resigned and its reliance on his

resignation was reasonable.  While PRMC still maintains that Mr. Taylor resigned,

assuming he was terminated, PRMC had legitimate, nondiscriminatory reasons for

doing so based upon "[Mr.] Taylor's uncooperative behavior during the

investigation into Chief Tull's alleged sexual misconduct, his failure to assist the

23

employee in the parking garage, and his 'improper, abusive, and even frightening'

conduct during his meeting with [Ms.] Scott."  (J.A. 824 (citation omitted)).

However labelled -- accepting his resignation or involuntary termination -- PRMC

had legitimate nondiscriminatory reasons for ending Mr. Taylor's employment.

## E.    Mr. Taylor Could Not Demonstrate Pretext.

Mr. Taylor argues that his termination could not have been based on his

actions in connection with the parking lot incident, the sexual harassment

investigation, and/or his behavior during the July 15 meeting, and that any such

reliance is pretext.  (App. Br. at 16-19).

As to the parking lot incident, Mr. Taylor baldly claims he did nothing

wrong and it is unlikely he would refuse to help a distressed employee based upon

his written evaluation.  (App. Br. at 17-18).  There is ample evidence to support

PRMC's conclusion that Mr. Taylor refused to assist the employee, misrepresented

material information on several occasions during the investigation into the

incident, plead ignorance (even after being confronted with videotape evidence

confirming that he was making false statements, *see* J.A. 237-44; 305-07), and

appeared deceptive by repeatedly changing his stories.  His attempt to explain the

situation by providing a "reasonable explanation" years later at his deposition is

irrelevant, and certainly not evidence of pretext.  (*See* App. Br. at 17-18).

24

As to the sexual harassment investigation, Mr. Taylor claims pretext because PRMC misinterpreted his behavior as being "uncooperative." (App. at 18). Mr. Taylor also states that he was terminated "for participating in an investigation into whether a high-ranking PRMC employee sexually harassed a subordinate." (App. at 18). This is not a record supported statement. Further, Mr. Taylor was terminated for, among other things, being difficult, evasive, changing his stories about the purported allegations, refusing to cooperate with PRMC's investigation, appearing deceptive, and continuing to make accusations against Chief Tull despite his refusal to assist in the investigation. (J.A. 249-57; 305-06; 808-09).

Mr. Taylor's reprehensible behavior in Ms. Scott's office on July 15, 2010, was the proverbial nail in the coffin for his employment with PRMC. He claims that his termination could not have been based on his actions and behavior during the meeting, and that any such reliance is pretext. (App. Br. at 19). His only support for pretext is that "he adamantly denies engaging in threatening or offensive behavior" during the meeting. (App. Br. at 19). The record is clear and Ms. Scott's testimony is consistent: Mr. Taylor exhibited "improper, abusive, and even frightening conduct during his meeting with [Ms.] Scott." (J.A. 824 (citation omitted)).

25

Mr. Taylor has offered no facts showing that the stated reasons for his discharge were pretext and that the real reason he was discharged was because he complained about discrimination.[16] (*See* J.A. 106-07; App. Br. at 14-19). His speculation about the reason why he was terminated cannot avoid summary judgment. *See Hawkins v. PepsiCo., Inc.*, 203 F.3d 274, 281 n.1 (4th Cir. 2000) (citation omitted), *cert. denied*, 531 U.S. 875 (2000) (holding that the district court properly granted summary judgment on plaintiff's retaliatory discharge claim because "[plaintiff] relies on mere speculation in asserting that her prior racial complaints were the real reason for her termination"); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985) ("Unsupported allegations as to motive do not confer talismanic immunity from Rule 56."); *Robinson v. Baltimore City Police Dept.*, 181 F. Supp. 2d 470, 474 (D. Md. 2002) ("[Plaintiff's] speculative reliance on the possibility of retaliatory motive is insufficient as a matter of law to avoid summary judgment on his [retaliation] claim.").

Moreover, the mere fact that Mr. Taylor complained about perceived discrimination does not immunize him from termination or give him *carte blanche*

---

[16] Mr. Taylor also argues that because he had positive evaluations throughout his employment, that the problems PRMC had with him in his final weeks must be pretextual. (App. Br. at 15-16). As explained above, Mr. Taylor received standard evaluations and raises, which have nothing to do with his actions during the final weeks of his employment. Further, all of the behavior in which he engaged, and which warranted discipline, occurred only in June and July 2010.

26

to act out, misbehave, and/or refuse to comply with the company's performance and conduct standards. *See Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) ("[t]he Title VII retaliatory discrimination provision was 'not intended to immunize insubordinate, disruptive or nonproductive behavior at work" and that "[a]t all times, employers retain the right to discipline or terminate employees for any legitimate, nondiscriminatory reason"). Likewise, Mr. Taylor is not permitted to use "The sword of [his] EEOC complaint . . . as a shield to protect [him] from the consequences of inappropriate behavior that is incontrovertibly below the reasonable expectations of his employer." *Pulley v. KPMG Consulting, Inc.*, 348 F. Supp. 2d 388, 397 (D. Md. 2004).

Now, four years post-employment and a year and a half since filing suit, the only basis Mr. Taylor can conjure for asserting that his separation from PRMC was pretext is the termination itself, and his own personal feelings and beliefs. There is no record evidence that PRMC treated Mr. Taylor differently and/or terminated him because he engaged in any protected activity. While Mr. Taylor may disagree with PRMC's characterization of the events leading up to his departure, that is irrelevant and insufficient to avoid summary judgment. *Hawkins*, 203 F.3d at 280 (with regard to judging a plaintiff's behavior, it is "the perception of the decision maker which is relevant, not the self-assessment of the plaintiff").

27

As the district court aptly observed:

> Taylor has not brought forth sufficient evidence to demonstrate that his expressed concerns more than likely motivated PRMC to terminate his employment, or that PRMC's proffered nondiscriminatory reasons for his termination are unworthy of credence.  Although Defendant maintains that it did not terminate Taylor, <u>it does not dispute that, had Taylor not preemptively indicated that he would resign, it would have terminated him</u>.  In fact, PRMC representatives testified to that effect at Taylor's unemployment benefits hearing.  <u>To the extent that Taylor argues that it was not his responsibility to participate in the investigation into Chief Tull, his assertions only serve to underscore Defendant's concerns regarding his uncooperative attitude and demeanor.  He has not raised any fact or inconsistency in explanation that would render PRMC's explanation of his discharge worthy of discredit.</u>
>
> [In fact], <u>Taylor's only [actual] 'evidence' regarding the pretextual nature of PRMC's proffered nondiscriminatory reasons is his insistence that PRMC is mischaracterizing his behavior</u>.  Although Taylor disagrees with Defendant's characterizations and perceptions of him and his conduct during the course of the investigations, <u>he has not provided any evidence showing that Defendant's stated reasons for its actions did not, actually, form the basis for its conduct</u>.  '<u>It is not enough for Plaintiff to allege pretext based on [his] own view of the truth; in order to rebut Defendant's non-discriminatory reason, Plaintiff's task is to proffer evidence showing that Defendant's stated reason was not the real reason for its actions.</u>'  *Khoury v. Meserve*, 268 F. Supp. 2d 600, 615 (D. Md. 2003) [*aff'd*, 85 Fed. Appx. 960 (4th Cir.

28

2004)].[17]  *See also Rogosin v. Mayor & City Council of Balt.*, 197 F. Supp. 2d 345, 353 (D. Md. 2002) ("<u>Whether [the employer's] beliefs were right or wrong is immaterial; what is relevant . . . is that [the employer] relied on those beliefs as grounds for dismissing Plaintiffs.</u>").  Here, <u>Taylor has provided the Court only his own speculation regarding the motives of PRMC officials and thus has failed to demonstrate that PRMC's legitimate, non-retaliatory reasons for his dismissal were pretextual</u>.

(J.A. 826-27) (emphasis added).

Mr. Taylor has no basis for his retaliation claim other than his own "rank speculation and inference-upon-inference recitations."  *Bryan*, 307 F. Supp. 2d at 728.  By its very nature, Mr. Taylor's retaliation claim is *ipse dixit*.

While Mr. Taylor does not need to agree with PRMC's employment decision, that does not make it retaliatory.  Indeed, Mr. Taylor presented PRMC with ample reason to take action and terminate him.  Mr. Taylor cannot, under any set of facts, establish that his internal complaints of discrimination and/or any other protected activity in which he engaged were the reason that his employment ended.  His behavior and failed manipulation created his problems; his protected activity was wholly irrelevant to the process.  He is the sole reason his employment ended.  Summary judgment was, and remains, appropriate.

---

[17]  "This court's task is not to sit, in this context, as a super personnel agency."  *Khoury*, 268 F. Supp. 2d at 615.

29

## V.    <u>CONCLUSION</u>

For the foregoing reasons, PRMC respectfully requests that this Honorable

Court affirm the decision of the district court.

Respectfully submitted,

*/s/*  Randi Klein Hyatt
Randi Klein Hyatt
Kevin M. Cox
Kollman & Saucier, P.A.
The Business Law Building
1823 York Road
Timonium, Maryland 21093
Ph: 410-727-4300
Fax: 410-727-4391
rhyatt@kollmanlaw.com
Attorneys for Appellee,
Peninsula Regional Medical Center

30

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No.   14-1271                **Caption:**  Brandon Taylor v. Peninsula Regional Medical Center

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.   **Type-Volume Limitation:**  Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines.  Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines.  Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count.  Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. Civ. P. 28.1(e)(2) or 32(a)(7)(B) because:

☑   this brief contains ___7748___ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐   this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   **Typeface and Type Style Requirements.**  A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑   this brief has been prepared in a proportionally spaced typeface using
____Time New Roman_____ [*identify word processing program*] in
____14_____ [*identify font size and type style*]; **or**

☐   this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

__(s)  Randi Klein Hyatt_____
Attorney for Appellee_____
Dated: 06/30/2014_____

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY That on this 30th day of June, 2014, a copy of the foregoing Appellee's Brief was mailed, first class, postage prepaid to Robin R. Cockey, Esquire, Cockey, Brennan & Maloney, PC, 313 Lemmon Hill Lane, Salisbury, Maryland  21801, attorney for Appellant.


_/s/_   Randi Klein Hyatt